| | |
|---|---|
| AMBER M. TINCH, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|      v. | )    Case No. 1:10-CV-326-TWP-DML |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
|     Defendant. | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Amber Tinch ("Claimant"), requests judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), denying Claimant's application for a period of disability and disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act. 42 U.S.C. § 405(g). For the reasons set forth in this opinion, the Court **REMANDS** the decision of the Commissioner.

## I.   BACKGROUND

### A.   PROCEDURAL HISTORY

On October 24, 2003, Gene Tinch ("Tinch") filed an application for a period of disability and DIB alleging that he became disabled on May 24, 1999. (Tr. 133.) Tinch's application was denied on January 23, 2004 (Tr. 98) and, upon reconsideration, was denied again on February 19, 2004. (Tr. 95.) Tragically, Tinch committed suicide in April of 2006 (Tr. 977), and his daughter, Claimant, was substituted as the party of interest. (Tr. 18.) A hearing held before the Administrative Law Judge ("ALJ") on October 10, 2006 resulted in an unfavorable decision on

March 20, 2007.  (Tr. 73.)  On December 14, 2007, Claimant appealed the unfavorable decision (Tr. 124), and the Administrative Appeals Judge remanded the case back to the ALJ.  (Tr. 89.) The ALJ held a second hearing on May 8, 2009 and issued a denial decision on June 2, 2009. On July 3, 2009, Claimant requested a review of the hearing decision.  This request was denied on January 19, 2010.  Upon the Appeals Council's denial of review, the ALJ's decision became the final decision by the Commissioner.  20 C.F.R. § 404.981; *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994.)  Claimant now requests review of the ALJ's decision pursuant to Title II of the Social Security Act, 42 U.S.C. § 405(g.)

**B.      TINCH'S WORK HISTORY**

Tinch was born on November 19, 1961, and was 44 years old at the time of his death. (Tr. 133.)  Tinch had a high school education and attained his GED in 1991.  (Tr. 193.)  From approximately 1981 to 1999, Tinch worked 40 hours per week as a carpet installer.  (Tr. 189.) Tinch's employment as a carpet installer required heavy lifting, walking and crawling.  (Tr. 189.) From 2003 through the date of his DIB application, Tinch worked weekends for 16 hours each week as a chemical dependency technician at LaVerna Lodge.  (Tr. 1158.)   Tinch stated that his injuries required him to cease his employment as a carpet installer and switch to part-time employment.  (Tr. 189.)

**C.      MEDICAL HISTORY**

On November 7, 2003, Tinch reported to the Social Security Administration that his ability to work was limited due to a back injury after an automobile accident, spinal fusion, diabetes, and severe depression.  (Tr. 188.)

### 1.      Back Pain and Spinal Fusion

In 1997, Tinch was treated by Dr. Carl Sartorius, M.D. ("Dr. Sartorius") for a back injury which he sustained while working as a carpet installer.  (Tr. 972.)  On November 5, 1997, Tinch underwent a microlumbar diskectomy performed by Dr. Sartorius.  (Tr. 970.)  On January 8, 1998, Dr. Sartorius stated that Tinch was off medication, his mobility and activity level were improving, and he could "return to work with no restrictions."  (Tr. 968.)

On June 21, 1999, Tinch was seen by orthopedic surgeon, Herbert Biel, M.D. ("Dr. Biel") for back pain after sustaining further injury in an automobile accident in May 1999.  (Tr. 465.)  On June 21, 1999, Dr. Biel diagnosed Tinch with degenerative disc disease L5-S1.  (Tr. 466.)   Approximately four months later, on November 1, 1999, Dr. Biel noted that after reviewing Tinch's CT discogram he informed Tinch of his option to pursue surgical stabilization of the L5-S1 segment.  (Tr. 459.)  Dr. Biel explained that the surgery allowed for a 50-70% chance of improvement.  (Tr. 459.)  On December 3, 1999, Dr. Biel performed a posterior spinal fusion with segmental instrumentation and left iliac crest bone graft of Tinch's L5-S1.  (Tr. 424.)  During a three month, post-operation follow-up, Dr. Biel instructed Tinch to return to work on the condition that he work only four days a week for two hours a day for four weeks.  (Tr. 453.)

Tinch was seen by physical therapist, Gwen Eshleman P.T. ("Eshleman"), for work conditioning on several occasions.  (See Tr. 387, 399, 412, 413.)  On April 13, 2000, Eshleman opined that Tinch fell within the medium physical demand level.  (Tr. 403.)  Medium work includes "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c.)

On June 21, 2000, following a post-operation appointment, Dr. Biel noted that Tinch was doing well, had minimal discomfort and was not taking any medication at that time.  (Tr. 451.)

Dr. Biel observed that the x-rays of the lumbar spine showed that the fusion was "nicely healed." (Tr. 451.)  On June 21, 2000, approximately six months post-operation, Dr. Biel cleared Tinch to return to work with the restriction that he was not to lift more than thirty-five pounds.  (Tr. 398.)

From June 1999 through September 2005, Tinch was also being seen by his family physician, Brian Kohles, M.D. ("Dr. Kohles") for back pain.  (Tr. 261; 275-76.)  Dr. Kohles prescribed Tinch Ibuprofen, Flexeril, and Lortab to address his complaints of lower back pain and muscle spasms.  (Tr. 281.)

On November 13, 2001, Dr. Kohles wrote a letter to the Family & Social Services Administration in which he stated that Tinch had chronic low back pain with numbness in his lower extremities.  (Tr. 271.)  Dr. Kohles further noted that an occupation which requires lifting or prolonged standing was not recommended and that repetitious bending and twisting should be avoided.  (Tr. 271.)

On November 14, 2003, Dr. Kohles wrote a letter to the Disability Determination Bureau. In this letter, Dr. Kohles stated that he had treated Tinch for approximately eight years and that Tinch had suffered several misfortunes including losing his wife in September 2003, having Type 1 diabetes, being involved in a motor vehicle accident in 1999, and injuring his back at work.  (Tr. 261.)  Dr. Kohles also said that Tinch had difficulty with being on time for office visits "due to lack of funds for his care."  (Tr. 261.)  Dr. Kohles stated that Tinch was "absolutely unable to lift or perform prolonged standing/bending/stooping."  (Tr. 261.)  Dr. Kohles opined that Tinch was "100% totally disabled and should be granted benefits concurring with this opinion."  (Tr. 261.)

Nearly two years later, on September 2, 2005, Tinch was seen at Dr. Kohles' office and appeared uncomfortable and trembling.  (Tr. 547.)  Dr. Kohles noted that Tinch's back pain was

persistent.  (Tr. 548.)  Later that month, on September 28, 2005, Dr. Kohles completed a Residual Functional Capacity ("RFC") questionnaire on Tinch's behalf.  (Tr. 534-538.)  Dr. Kohles diagnosed Tinch with back pain, degenerative disk disease and Type I diabetes.  (Tr. 534.)  Dr. Kohles noted that Tinch's pain was moderately well controlled with morphine which would allow him to perform activities of daily living but not physical labor or lifting.  (Tr. 534.)  Dr. Kohles also stated that Tinch's emotional factors contributed to the severity of his symptoms and functional limitations.  (Tr. 535.)  Dr. Kohles believed that Tinch was not qualified for any sedentary job unless it was something like "babysitting" with clients doing everything for him.  (Tr. 535.)  Dr. Kohles opined that Tinch could (1) sit fifteen minutes at one time before needing to get up, (2) stand for ten minutes before needing to sit down, (3) stand/walk for less than two hours, (4) never twist, stoop, crouch, or climb ladders or stairs, (5) occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift and carry twenty pounds (Tr. 536-37.)  Finally, Dr. Kohles stated that Tinch's prolonged inability to work and the death of his wife contributed to an emotional condition of situational depression.  (Tr. 538.)

## 2. Diabetes

Tinch was diagnosed with diabetes in 1983.  (Tr. 248.)  On June 10, 2005, Tinch was treated by Christopher Rocco, M.D. ("Dr. Rocco") for complaints of numbness of his right face and right arm.  (Tr. 788.)  During evaluation, Dr. Rocco's impression was distal sensory motor peripheral polyneuropathy secondary to diabetes mellitus.  (Tr. 789)

On September 17, 2005, Tinch was treated at Community Hospital—Anderson for abdominal pain, difficulty in breathing, and chest pain.  (Tr. 1089.)  An emergency room physician diagnosed Tinch with diabetic ketoacidosis.  (Tr. 1090.)

### 3. Depression

From January 2002 through February 2005, Tinch was seen at the Center for Mental Health for counseling and medication evaluation for anxiety, stress and dysrhythmia. (Tr. 304-44, 944.) Tinch reported that he began experiencing symptoms of depression after his motor vehicle accident in 1999. (Tr. 338.) During Tinch's initial visit in January 2002, intake clinician Dennis Banther, LMHC, LCSW, diagnosed Tinch with "Adjustment Disorder with Anxiety and Depressed Mood" and "Posttraumatic Stress Disorder." (Tr. 342.) During Tinch's treatment at the Center for Mental Health, Tinch was prescribed Zoloft, Ambien, Restoril, Paxil, Tegretol, and Valium. (Tr. 304, 337.)

On March 4, 2004, Addictions Therapist Heather Moody ("Moody"), supervised by Psychologist Gregory Richardson, M.D., completed a psychiatric status report for Tinch. (Tr. 219-25.) Moody diagnosed Tinch with post traumatic stress disorder and major depression and found Tinch's current Global Assessment of Functioning ("GAF") score to be 50, while his highest GAF score in the past year was 55. (Tr. 219.) Moody noted that Tinch's current prognosis was "[f]air" but that he occasionally would have suicidal thoughts when he became overwhelmed. (Tr. 224.)

On June 11, 2004, during a medication check up with psychiatrist Oleh Dzera, M.D. ("Dr. Dzera"), Tinch appeared stable without any signs of decompensation or side effects to his medication. (Tr. 955.) Dr. Dzera noted that Tinch had no suicidal or homicidal ideation and demonstrated no behavior indicative of such ideation. (Tr. 955.) Tinch reported that he wanted to start titrating off his Valium, and at that time, he was only taking five milligrams every other day, whereas he was originally taking five milligrams daily. (Tr. 955.)

On August 6, 2004, during an individual therapy session with Moody, Tinch reported that he was "functioning well; taking his meds as prescribed, eating healthy, managing health care needs, socializing, managing family relationships, maintaining good sleep habits, managing work responsibilities, and abstaining from narcotic medicine." (Tr. 953.)

At another individual therapy session with Moody on September 3, 2004, Tinch reported a stable mood and environment but expected "some grief and sadness due to the upcoming anniversary of his wife's death…." (Tr. 952.)

On December 10, 2004, during a medication check up with Dr. Dzera, Tinch reported that his psychiatric medications were helping him, and he wished to continue their use. (Tr. 949.)

On February 17, 2005, Moody completed a discharge summary, wherein she noted that Tinch's discharge conditions had improved. (Tr. 947.) Tinch reported stability of mood. (Tr. 947.) Moody diagnosed Tinch with post-traumatic stress disorder and depressive disorder. (Tr. 947.) She described Tinch's current prognosis as "[g]ood" and found Tinch's discharge GAF score to be 55. (Tr. 947.)

## D.    SOCIAL SECURITY ASSESSMENTS

### 1.    Social Security Disability Examination

On December 19, 2003, Tinch underwent a disability examination with Anton Kojouharov, M.D. ("Dr. Kojouharov".) (Tr. 248.) Dr. Kojouharov's impression was injury of lumbosacral spine in 1997, surgically treated with discectomy, injury of lumbosacral spine in 1999, surgically treated with spinal fusion surgery, chronic lumbosacral spine pain, degenerative disk disease, insulin dependent diabetes mellitus, depression, and nicotine addiction. (Tr. 251.)

## 2.     Physical RFC Assessment

On January 19, 2004, Tinch underwent a physical RFC assessment with J. Corcoran, M.D. ("Dr. Corcoran".)   (Tr. 240-47.)   Dr. Corcoran found that Tinch had the following exertional limitations:   (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk for about 6 hours in an 8-hour workday; (4) sit for about 6 hours in an 8-hour workday; and (5) ability to push and/or pull was unlimited except as shown in the lift/carry limitations.  (Tr. 241.)   Dr. Corcoran based his findings on Tinch's lumbar fusion and antalgic gait.  (Tr.241.)  As to Tinch's postural limitations, Dr. Corcoran found that Tinch could occasionally climb ramps, stairs, ladders, rope and scaffolds, balance, stoop, kneel, crouch and crawl. (Tr. 242.) Dr. Corcoran found that Tinch had no manipulative, visual, communicative or environmental limitations. (Tr. 243-44.)

## 3.     Mental Status/Psychiatric Examination

On January 7, 2004, at the request of Social Security Administration, Tinch was evaluated by psychologist Carrie Dixon, Ph.D. ("Dr. Dixon").  (Tr. 253-256.)  Tinch informed Dr. Dixon that his daily activities included bathing, dressing, grooming, cooking lunch six times a week, running the sweeper, doing some dishes, and short trips to the grocery store.  (Tr. 254.)  Tinch reported that his depression began in 2000 because he was unable to go back to his full-time job or provide for his family.  (Tr. 254.)  When asked about his symptoms of depression, Tinch reported that he would "[c]ry a lot, stay at home a lot, or sometimes I'll stay in bed for a couple days."  (Tr. 254.)  He admitted having suicidal ideations but said that he had no plan to follow through.  (Tr. 254.)  Tinch also admitted to one suicide attempt that occurred shortly after the death of his wife.[1]  (Tr. 254.)  Tinch denied having any homicidal ideations.  (Tr. 254.)

---

[1] Tinch informed Dr. Dixon that he "[t]ook a lot of insulin one day, more than I would normally take and hoped I wouldn't wake up."  (Tr. 254)

Dr. Dixon performed a mental status examination on Tinch and concluded that Tinch appeared capable of managing his own funds, exhibited signs of good reality contact, exhibited intact memory skills, and experienced no difficulty performing simple calculations. She diagnosed Tinch with depressive disorder and assigned a GAF score of 65. (Tr. 256.)

On January 20, 2004, R. Klion, Ph.D. ("Dr. Klion") completed a psychiatric review technique form. (Tr. 226.) Dr. Klion found that Tinch had mild difficulties regarding activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (Tr. 236.) Dr. Klion noted that Tinch works 16 hours per week and is limited due to physical problems. (Tr. 238.) Dr. Klion further stated that Tinch prepares lunch for himself daily and does light housework as necessary. (Tr. 238.) Dr. Klion indicated that Tinch's mental impairment was not seen. (Tr. 238.)

On December 26, 2005, Tinch underwent a mental status examination with Robert Fischer, Ph.D., H.S.P.P. ("Dr. Fischer".) (Tr. 486.) Tinch informed Dr. Fischer of the motor vehicle accident in 1999 and that he still experienced flashbacks and occasional nightmares. (Tr. 486.) He could rarely drive and being in a motor vehicle caused him stress. (Tr. 486.) Tinch stated that he had been depressed since the accident. (Tr. 486.) Tinch further explained that he could barely dress and bathe himself, and he could not do any household chores. (Tr. 486.) Tinch indicated that he liked to read, watch television, and phone family members. (Tr. 486.) Tinch informed Dr. Fischer of his one suicide attempt but claimed to have suicidal ideation only very rarely. (Tr. 486.) Dr. Fischer diagnosed Tinch with major depressive disorder (recurrent, severe), generalized anxiety, and post-traumatic stress disorder and assigned a GAF of approximately 40. (Tr. 488.)

## E. THE HEARINGS

Two hearings were held on this matter. The first was held on October 10, 2006 (Tr. 1161), and a second was held on May 8, 2009. (Tr. 1222.)

### 1. Hearing held on October 10, 2006

#### i. Testimony of Tinch's Children

Claimant testified that she lived with Tinch after his automobile accident until June 2003. (Tr. 1197-1198.) After his accident, Tinch could no longer coach the children in sports, and he had difficulty finishing household chores because of his back pain. Claimant testified that she believed Tinch was depressed and that although Tinch had both good days and bad days, his bad days were more frequent than his good days. (Tr. 1199-1200.) However, Claimant stated that Tinch did not mention thoughts of suicide, other than in a joking manner, while she lived with him. Finally, Claimant testified that Tinch told her that his job at LaVerna Lodge was a "babysitter job" and that "he could lay down on the couch" and watch television. (Tr. 1202.)

Claimant's brother, Andrew Tinch ("Andrew"), also testified at the October 2006 hearing. (Tr. 1202.) Andrew testified that he moved out of his father's house in 2004 but moved back after approximately one year. (Tr. 1203-04.) Andrew stated he moved back in with Tinch because he wished to help take care of him and did not feel that Tinch could take care of himself. (Tr. 1204-05.) Finally, Andrew noted that he saw no improvement in Tinch's mental condition in the final months leading up to his death. (Tr. 1205.)

Claimant's sister, Kristina Anderson ("Kristina"), testified that she lived with Tinch until August 2005. (Tr. 1207.) After the accident, Tinch was emotionally depressed and cried approximately three times a week. (Tr. 1208.) Kristina stated that, after her wedding in

November 2005, Tinch spoke of suicide "once maybe every three weeks, but towards the end, it was like once a week.  It was like a cry wolf type thing."  (Tr. 1209.)

### ii.  Medical Experts' Testimony

### a.  Physical Impairments

Richard Hutson M.D. ("Dr. Hutson"), who is board certified in orthopedic surgery, testified as a medical expert.  (Tr. 1163.)  Dr. Hutson testified that the record contained evidence of back impairment, specifically, a degenerative disk disease at the lumbosacral level with decreased disc space.  (Tr. 1164.)  Dr. Hutson referred to Tinch's discogram done in 1999 and Dr. Biel's treatment notes.  (Tr. 1164.)  Dr. Hutson testified that Tinch's impairment did not have appropriate loss of neurological function and therefore did not meet the appropriate impairment listing.  (Tr. 1165.)  He further testified that the physical therapist restricted Tinch to medium work, which was consistent with Dr. Biel's opinion a month later.  (Tr. 1165.)  Dr. Hutson stated that there was no rationale to support Dr. Kohles' assessment that Tinch could not work for eight hours.  (Tr. 1167.)  Dr. Hutson further disagreed with Dr. Kohles' assessment that Tinch must avoid lifting or prolonged standing and repetitious bending and twisting.  (Tr. 1169.)  Dr. Hutson opined that a person with a spinal fusion could sit or stand six hours out of an eight-hour day.  (Tr. 1170.)  Dr. Hutson further disagreed with Dr. Kohles' opinion that Tinch was "100 percent disabled." (Tr. 1170.)  Dr. Hutson said that this assessment by Dr. Kohles lacked objective findings.  (Tr. 1170.)  Dr. Hutson also found Dr. Kohles' assessment that if Tinch had a job at which he worked eight hours per day, it would have to include periods of walking around every 10-15 minutes for as long as five minutes each lacked objective medical support.  (Tr. 1174.)  However, Dr. Hutson conceded that that there is no objective test for pain.  (Tr. 1174.)

#### b.    Mental Impairments

In addition to Dr. Hutson's testimony, Jack Thomas M.D. ("Dr. Thomas"), a licensed clinical psychologist, testified at the hearing.  (Tr.1178-97.)  Dr. Thomas testified that the record showed Tinch's medical impairments were major depressive disorder (recurrent, severe) and post-traumatic stress disorder. (Tr. 1179.) Dr. Thomas stated that Tinch's medical treatment dated back to 2002 and that he was compliant with treatment. (Tr. 1180.)  Tinch received a GAF of 45 and was having "serious symptomatology" when he first arrived at the Center for Mental Health. (Tr. 1180.) Throughout his treatment between 2000 and 2003, Tinch managed his psychiatric symptoms fairly well.  (Tr. 1180.)  However, a report in December 2005 indicated more severe symptoms and a GAF of 40.  Dr. Thomas also noted that an MMPI-II (Minnesota Multiphasic Personality Inventory) ("MMPI") indicated that Tinch had a tendency to underreport his symptoms.   (Tr. 1181.)   When asked whether it was likely that Tinch had been underreporting his condition at previous evaluations, Dr. Thomas responded that doctors will correct for any underreporting through their own objective observations. (Tr. 1193-94.) Dr. Thomas noted that the GAF score of 40 assessed in December 2005 was probably appropriate; however, Tinch's GAF scores through his record indicate that his GAF was "largely in the moderate range." (Tr. 1183.)  Dr. Thomas testified that his December 2005 score was indicative of a decompensated state from which a person will generally "return to baseline particularly with medical care." (Tr. 1185.)  Tinch had been decompensated, but there was no available evidence after that date to suggest a listing-level impairment. (Tr. 1187.)  Dr. Thomas testified that a person with a consistent GAF of 50 would be unable to work, but a person with a GAF between 50-55 could work and "sustain low stress environment probably without missing days." (Tr. 1192-93.)

### iii.      Vocational Expert's Testimony

Constance Brown, the vocational expert ("VE") testified that Tinch's work at LaVerna Lodge would be most appropriately categorized as "[l]ight, semiskilled work." (Tr. 1212.) The ALJ then asked the VE to consider a hypothetical individual of the same age, work experience, education, and physical and social limitations as Tinch and asked whether there were any jobs in the state economy that would be available to such an individual. (Tr. 1215-1216.) The VE responded in the affirmative and listed several jobs that involved light and sedentary work that such an individual could perform. (Tr. 1216.) Those jobs included assembly work (14,000 light jobs and 2300 at the sedentary level), inspector and tester work (4,800 light and 500 sedentary), housekeeping (8,000 light), and clerical work (1,900 jobs.) (Tr. 1216.)

### 2.      Hearing held on May 8, 2009

### i.      Testimony of Tinch's Children

Claimant testified that, prior to Tinch's automobile accident, she had never seen him cry. (Tr. 1239.) After the accident, he cried three to four times a week, and after his wife passed, Tinch cried every day for approximately three months. (Tr. 1240-1241.) After that three month period, Claimant moved out of the house and saw Tinch "[o]nce a month, if that" during the last six months before Tinch's death. (Tr. 1243.) Claimant testified that she believed Tinch's condition was getting worse during that time. (Tr. 1244.) He worked on the weekends but still wore the same clothes during the week. Claimant estimated that he showered once or twice a week. (Tr. 1244-45.)

Andrew testified that he witnessed Tinch cry on a daily basis both before and after Tinch's wife died. (Tr. 1247-48.) Andrew stated that Tinch showered and shaved approximately once a week and often wore the same clothes to bed. (Tr. 1248-49.) Andrew also testified that

he took guns out of the house because Tinch called his daughter to "tell her goodbye" on four or five separate occasions. (Tr. 1250.)

### ii. Medical Experts' Testimony

#### a. Physical Impairments

Dr. Hutson testified that his opinion had not changed after a subsequent review of the entire record. (Tr. 1228.)

#### b. Mental Impairments

Dr. Thomas testified that his opinion that Tinch could have performed simple and repetitive work had not changed. (Tr. 1229.) He acknowledged that the MMPI showed a tendency for "very slight underreporting" but the objective medical results would be largely the same. (Tr. 1230.) When asked about Tinch's suicide attempt, he testified that it was "a passive way of not wanting to continue with life due to bereavement" and was provoked, in part, by his wife's death. (Tr. 1231.) He also added that such a state would not be likely to persist. (Tr. 1231.) In regard to the December 2005 GAF score of 40, he testified that it was probably "a little bit too low," and Tinch was probably "in the moderate range rather than the severe range." (Tr. 1233.) When pressed to give what he believed to be a more accurate figure, Dr. Thomas stated that Tinch's GAF was 51. (Tr. 1235.)

## II. <u>DISABILITY AND STANDARD OF REVIEW</u>

To be eligible for disability insurance benefits, a claimant must establish a disability under 42 U.S.C. § 423. "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled, the ALJ must evaluate the claim based on the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ must consider whether the claimant is engaged in a substantial gainful activity. If the claimant has engaged in such activity, then he is not disabled. *Id.* Second, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement set forth in 20 C.F.R. § 404.1509, or a combination of impairments that meet the duration requirement, the claimant is not disabled. *Id.* In the third step of the analysis, the ALJ considers the medical severity of claimant's impairments. If claimant has an impairment that meets or is equal to one of the impairments listed in Appendix 1 of this section and meets the duration requirement, the claimant is disabled. *Id.* At step four, the ALJ considers the assessment of claimant's RFC and his past relevant work, and if the claimant is still able to do his past relevant work, the claimant is not disabled. *Id.* The last step of the evaluation process requires the ALJ to consider the claimant's RFC assessment, age, education, and work experience to determine if claimant can make an adjustment to other work. If an adjustment can be made, claimant is not disabled. *Id.* The burden of proof during steps one through four is on the claimant; however, the burden shifts to the Commissioner at step five. *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir. 1995).

The district court is vested with jurisdiction to review the Commissioner's denial of benefits. 42 U.S.C. § 1383(c)(3). However, the court's standard of review in disability cases is limited. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citation and quotations omitted). The court must determine whether the final decision of the Commissioner is supported by substantial evidence and is based on the proper legal criteria. *Id.* (Citation omitted.) Substantial

evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (Citation and quotations omitted.)  If the Commissioner's findings are supported by substantial evidence, the ALJ's decision will be upheld.  *Id*.

While reviewing the record, the court will conduct a critical review of both the evidence that supports and detracts from the Commissioner's final decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citation omitted).  "[T]he decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quotation marks omitted).  In addition, the court will review whether the ALJ rationally articulated the grounds for his decision, and a remand may be required if the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion."  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001).  However, the court must not attempt to substitute its judgment for the ALJ's "by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility."  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (quoting *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)).

### III. DISCUSSION

**A.    THE ALJ'S FINDINGS**

Pursuant to the Social Security Regulations, the ALJ made the following findings as to Tinch's claim.  At step one, the ALJ found that Tinch was not engaged in substantial gainful activity during the period from his alleged onset date of May 24, 1999 through his date last insured of September 30, 2006.  (Tr. 20.)  At step two, the ALJ determined that Tinch "has the following severe impairments: degenerative disc disease of the lumbar spine, diabetes, past history of ulcer and stroke conditions, anxiety/post-traumatic stress disorder and depression."

(Tr. 21.)  At step three, the ALJ found that Tinch's impairments or combination of impairments did not meet or medically equal a listed impairment.  (Tr. 21.)  At step four, the ALJ made the following finding as to Tinch's RFC determination through the date he was last insured:

> … the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant's work could not have required climbing ropes, ladders, or scaffolds; must have been limited simple and repetitive tasks; and has only occasional contact with the general public.

(Tr. 23.)  At step four, the ALJ found that Tinch was unable to perform any past relevant work.  (Tr. 29.)  At step five, the ALJ denied Tinch's claim because the ALJ found that there were a significant number of jobs in the national economy that Tinch could have performed.  (Tr. 29.)

## B.     CLAIMANT'S ARGUMENTS ON APPEAL

Claimant presents four arguments to this Court on appeal.  First, Claimant contends that the ALJ erred in picking and choosing only the evidence that supported his unfavorable decision.  Second, Claimant argues that the ALJ erred in placing a negative inference on the absence of a mental illness diagnosis during the last months of Tinch's life.  Third, Claimant argues that the ALJ was wrong to state that Tinch's part-time work in a "somewhat of a sheltered work environment" that did not rise to the level of substantial gainful activity constituted "convincing evidence" that Tinch's physical and mental impairments were not totally disabling.  Pl.'s Br. at 24.  Fourth, Claimant argues that the ALJ erred in rejecting the opinion of Tinch's treating physician Dr. Kohles.  Each argument is addressed below.

### 1.     Discussing only the Evidence Favorable to the ALJ's Decision

It is not permissible that "the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994) (citation omitted).  Claimant cites several instances throughout the ALJ's decision in which she believes the ALJ

erred by discussing only the testimony and evidence that was favorable to his decision to deny disability benefits. This court will address each of those instances in turn.

It is not required that the ALJ evaluate each piece of evidence or testimony submitted and discuss that evidence fully and separately. *Id.* "However, a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984.)

Claimant contends that the ALJ erred by picking specific portions of Dr. Thomas's testimony while excluding others. First, the ALJ did not address the fact that the MMPI indicated that Tinch may have had a tendency to underreport his symptoms. While this is true, Claimant neglects to recognize the fact that Dr. Thomas also testified that this propensity to underreport was "very slight" and that evaluations rely on objective observations of the doctor which correct for any underreporting. (Tr. 1230, 1194.) Dr. Thomas' testimony effectively rebuts the presumption that Tinch's propensity to slightly underreport was considerable evidence countering the ALJ's decision. Therefore, this Court cannot say that the ALJ was unreasonable in failing to articulate that particular piece of testimony.

Next, Claimant argues that the ALJ failed to acknowledge a discrepancy in Dr. Thomas' two testimonies regarding the accuracy of the GAF score of 40 rendered by Dr. Fischer in December of 2005. Dr. Thomas stated at the first hearing that the GAF of 40 was probably appropriate but stated at the second hearing that the score was likely "a little bit too low." Claimant argues that the failure of the ALJ to point out this discrepancy constitutes erroneous picking and choosing of evidence on the part of the ALJ. This Court disagrees. At both hearings, Dr. Thomas' ultimate conclusion was that Tinch was generally in the moderate range

and that he could sustain light work. At the outset of the second hearing, Dr. Thomas stated that, after a subsequent review of the record, his opinion on the matter had not changed. Therefore, the Court finds this discrepancy insignificant in the grand scheme of Dr. Thomas' testimony. The ALJ did not err by neglecting to reconcile the slight discrepancy in Dr. Thomas' testimony.

Claimant also takes issue with the ALJ's treatment of Tinch's ability to perform daily living activities. First, Claimant alleges that Tinch's pronouncements that he was able to perform these activities were made in evaluations prior to his wife's death, and the ALJ did not consider the possibility of a decline in such ability after that unfortunate change in Tinch's circumstances. Unfortunately, on this point, Claimant is mistaken. The evaluation from which the ALJ cited as evidence that Tinch "independently [performed] daily living activities" was done in January 2004, approximately five months *after* his wife's death. (Tr. 23; 253-54.) Moreover, the report specifically mentioned that "[Tinch] has been widowed since September 2003." (Tr. 253.)

Second, Claimant contends that the ALJ's use of a friend's statements regarding his ability to perform daily living activities is misleading because the ALJ failed to mention other statements by that person indicating that some activities were difficult for Tinch, that he had to take breaks while completing those tasks, and that he was emotional and cried a lot. Pl.'s Br. 21-22. While it is true that the ALJ did not acknowledge these other portions of the friend's statement, the ALJ did acknowledge testimony from Tinch's children regarding a "lack of personal hygiene, crying spells and prolonged sleeping." (Tr. 25.) This Court finds that the children's testimony provides roughly the same probative value. The ALJ's alleged failure to make use of each piece of the friend's statements was not error when he articulated other evidence that provided the same substance. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.

1993) (ALJ did not err by failing to explicitly recognize evidence that would merely corroborate other evidence the ALJ recognized and be "essentially redundant").

Claimant argues that the ALJ gave a distorted view of Tinch's physical problems. Specifically, Claimant argues that the ALJ did not sufficiently articulate Tinch's reports of pain related to his back problems. The ALJ noted Tinch's successful spinal fusion surgery and mentioned statements made by Tinch that the pain was not bad. (Tr. 25.) Claimant contends that the ALJ should have gone further by referencing other statements by Tinch regarding his level of pain. However, before discussing his surgery and the intensity of Tinch's pain, the ALJ concluded that Tinch's statements regarding his level of back pain were not entirely credible. (Tr. 25.) *See Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) (hearing officers are in the best position to determine credibility and such determinations are afforded special deference). This Court can find little reason for requiring that the ALJ discuss at length a claimant's reports of pain when such testimony has previously been found to be less than credible.

Finally, Claimant takes issue with the ALJ's discussion of Tinch's mental condition after the death of Tinch's wife and alleges that the ALJ failed to adequately articulate and weigh Tinch's suicide attempts and eventual suicide. The Court finds merit in this contention. In his decision, the ALJ makes note of a report from the Center for Mental Health in which "claimant responded with appropriate grief and was not suicidal" approximately one month after the death of Tinch's wife. The ALJ followed this with a vague reference to "some understandable bouts with severe depression" suffered by Tinch. (Tr. 26.) While his description of the Center for Mental Health's report is accurate in the strictest sense, the ALJ's remaining characterization of Tinch's mental state after September 2003 is wanting. There is no reference in the ALJ's decision to Tinch's suicide attempt following the death of his wife. The Court finds this

particularly troubling considering the fact that the ALJ expressly noted that Tinch was not suicidal after his wife's death. Moreover, the ALJ's reference to "understandable bouts of severe depression" cannot be held to be an adequate representation of Tinch's suicide attempt, if that was indeed the ALJ's intent. An event of such gravity constitutes considerable evidence which counters the ALJ's decision and must be afforded its due attention. Likewise, the ALJ failed to consider testimony from Tinch's son who had removed guns from Tinch's home on several occasions as a response to Tinch's suicidal behavior. This testimony should also be considered as part of the same line of evidence which runs contrary to the ALJ's decision. In addition, the ALJ's sole discussion of Tinch's eventual suicide is found in a footnote in which it was stated that "the concerns raised by the Appeal Council with regard to the claimant's April 2006 suicide on the severity of his depression was fully considered both at that time and presently." (Tr. 27.) The ALJ's conclusory statement on this matter is insufficient.

An administrative law judge may not "ignore an entire line of evidence that is contrary to her findings, … rather she must articulate at some minimal level [her] analysis of the evidence to permit an *informed review*." *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001) (internal quotations and citations omitted; emphasis added). Without discussion of the aforementioned evidence, the Court's ability to perform an informed review is unduly frustrated.

While the Court recognizes that the existence of a suicide attempt or even Tinch's actual suicide are not dispositive in determining disability, it is required that the ALJ provide a full analysis of the evidence and state the reason for the decision in a cognizable manner. It cannot be said that the ALJ's decision is supported by substantial evidence without a well-reasoned explanation for the rejection of significant evidence. The ALJ's failure to adequately address the evidence contrary to his finding warrants remand.

## 2. ALJ's Treatment of the Absence of Medical Documentation

Claimant's next challenge to the ALJ's decision concerns the ALJ's treatment of the absence of medical evidence relating to Tinch's depression during the last months of Tinch's life. Claimant contends that the ALJ erroneously placed a negative inference on this absence of medical documentation and used that absence as a means for denying disability benefits to Tinch. However, this contention is not supported by the record.

In fact, the ALJ acknowledged that there was a "critical gap" during the months prior to Tinch's death in which there was no record of mental health treatment. The ALJ stated that "[s]ince there is no evidence in the record for that time period, speculation as to the claimant's mental state during this time, would be an improper manner of assessing his function during…." (Tr. 27.)

Claimant counters that the deterioration of Tinch's mental state is not a matter of speculation, but rather, a matter of circumstantial evidence. In support of this position, Claimant cites *Wilder v. Apfel,* 153 F.3d 799 (7th Cir. 1998). In *Wilder,* an expert witness testified that he could not offer an opinion as to whether the claimant was afflicted with depression during the years prior to the first mention in the records of psychiatric disorder. The expert further testified that although the lay witnesses' testimonies pointed to the fact that claimant's depression had existed during that time period, the testimony was irrelevant because there was not contemporaneous medical evidence to support the earlier diagnosis.

The *Wilder* administrative law judge then adopted the position of the expert and found that a diagnosis of severe depression could not be made without contemporaneous medical evidence. On appeal, the Seventh Circuit Court of Appeals ultimately disagreed with this finding and held that a diagnosis of mental illness requires only, "contemporaneous corroboration of the

mental illness, … not necessarily contemporaneous medical corroboration." *Id.* at 802 (citations omitted). *Wilder*, therefore, stands for the proposition that when corroborating evidence exists that supports a diagnosis of mental disease, absence of medical documentation cannot alone lead an ALJ to ignore the allegation of mental disease.

Here, unlike the administrative law judge in *Wilder,* the ALJ did not refuse to recognize the existence of Tinch's depression during that "critical gap". There is no question that Tinch's depression persisted during that period; rather, the issue was whether his symptoms of depression were severe enough to warrant a finding of disability. The ALJ concluded that there was not sufficient evidence to support the conclusion that Tinch's degree of depression met the requisite level. Claimant alleges that the ALJ failed to consider contemporaneous evidence offered via the testimony of Tinch's children and evidence from Dr. Kohles' office notes. However, the ALJ did address contemporaneous evidence from these parties regarding this time period and weighed that evidence in accordance with Social Security Ruling 96-7p. (Tr. 28-29.)

In this case, the absence of medical documentation in the last months of Tinch's life did not lead the ALJ to conclude that Tinch's depression did not exist during that period. Instead, the ALJ found that the evidence was not sufficient to support the claim that Tinch's depression worsened well below the moderate level during that period. Therefore, it cannot be said that the ALJ erred in his analysis of Tinch's mental condition during the time when no medical documentation regarding that condition existed. While the Court recognizes the ALJ's general acknowledgement of the contemporaneous evidence, the ALJ's assessment of this evidence is nonetheless subject to the additional assessment of evidence pertaining to Tinch's suicide and suicide attempts, for which this case is remanded.

### 3.     The ALJ's Consideration of Tinch's Part-time Employment

Claimant contends that the ALJ's consideration of Tinch's part-time job as evidence that Tinch was not disabled was error.  In support of this contention, Claimant cites *Wilder v. Chater,* 64 F.3d 335 (7th Cir. 1995).  "The fact that someone is employed is not proof positive that he is not disabled, for he may be desperate and exerting himself beyond his capacity, or his employer may be lax or altruistic." *Id.* at 337-338 (citations omitted).  Claimant maintains that Tinch's insistence on holding a part-time job under such sheltered work conditions cannot be held against him as "proof positive" that he was not disabled.

Although the Court acknowledges that Claimant has undoubtedly stated an accurate description of the law on this point, Claimant has misapplied it in this instance.  Indeed, Tinch's part-time employment cannot be considered by the ALJ to be proof positive that Tinch is not disabled, especially in light of the fact that Tinch participated in what the ALJ recognized as "somewhat of a 'sheltered' work environment."  (Tr. 21.)  That said, Claimant's contention that the ALJ viewed this information as convincing evidence is unpersuasive.  While it is true that the ALJ stated that Tinch's part-time employment was the "most convincing evidence" that Tinch was not totally disabled, that information was seen neither as conclusive nor proof positive.  (Tr. 28.)  Rather, Tinch's part-time employment was but a single factor, among several, upon which the ALJ made his determination.  Tinch's part-time employment was measured in conjunction with other considerations such as Tinch's RFC and testimony by both medical experts.  *See Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008) (the administrative law judge properly considered a claimant's part-time employment when finding that such work cut against his claim of disability).  The concept that part-time employment is not proof positive that a person is not

disabled does not extend so broadly so as to preclude an ALJ from utilizing that fact as one among many in making a determination.

This Court cannot say that it was unreasonable for the ALJ to consider Tinch's part-time work as a factor in making his determination. It is within the purview of the ALJ to consider all relevant factors and to weigh them appropriately in order to make the most accurate determination possible. Therefore, the ALJ's consideration of Tinch's part-time employment was not error.

**4.    Rejection of the opinion of Dr. Kohles, a treating physician**

Lastly, Claimant argues that the ALJ erred in discounting the opinion of Dr. Kohles, who was one of Tinch's treating physicians. Generally, the opinion of a treating physician is entitled to controlling weight by the ALJ because such opinions often provide a "detailed, longitudinal picture" of a person's medical impairments. 20 C.F.R. § 404.1527(d)(2). However, a treating physician's opinion is deserving of such weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id. See also Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004).

The ALJ determined that Dr. Kohles' opinion was not entitled to controlling weight in this case because it was "without objective supporting documentation" and "primarily based upon subjective opinion". (Tr. 28.) The ALJ further noted that Dr. Kohles' opinion was inconsistent with the medical opinion of Dr. Biel, another treating physician, and Dr. Hutson, who testified as a medical expert at both hearings.

In his letter sent on November 7, 2008, Dr. Kohles noted an MRI examination and went on to explain his decision to prescribe pain medication to Tinch. (Tr. 1160.) Dr. Kohles noted in

that letter that he was "not in the habit of providing narcotics upon request" and that he was "convinced [Tinch] needed narcotics for his severe pain due to observations made in my office and outside it as I frequently observed him moving around visiting his wife in the hospital." (Tr. 1160.) Dr. Kohles went on to say that there was "never any doubt" that Tinch was disabled. (Tr. 1160.) Claimant argues that the explanation given therein constitutes proof that Dr. Kohles' opinion is supported by objective medical documentation. This Court, however, must disagree.

Although Dr. Kohles authored two letters in which he advocated that Tinch was "100% totally disabled," (Tr. 261, 1160), both letters are devoid of any objective rationale upon which Dr. Kohles based his opinion. Furthermore, Dr. Hutson's testimony bolsters the position that Dr. Kohles' opinion is not entitled to controlling weight. Dr. Hutson stated that Dr. Kohles' statements that Tinch could not work an eight hour day, could sit less than two hours in an eight hour day, and that he could never carry twenty pounds were unsubstantiated by evidence in the record and lacked an objective rationale. (Tr. 1167.)

The ALJ relied upon the medical facts in the record as well as testimony given by Dr. Hutson in determining that little weight was to be given to Dr. Kohles' opinion. There is substantial evidence to support the ALJ's conclusion that the record in this case lacks objective support for statements made by Dr. Kohles concerning Tinch's degree of disability. Therefore, the ALJ did not err in failing to give controlling weight to the opinion of Dr. Kohles.

## IV. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner of Social Security is hereby **REMANDED.**

SO ORDERED.

DATE: _07/21/2011_____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Thomas E. Hamer
tom@tomhamerlaw.com

Thomas E. Kieper
United States Attorney's Office
Tom.kieper@usdoj.gov